## Locke v. Commonwealth.

(Decided June 13, 1911.)

## Appeal from Jefferson Circuit Court (Criminal Division).

1. Homicide—Husband Killing Wife—Trial—Affidavit for Continuance—Absence of Witnesses—On the trial of a husband for murder by stabbing his wife, a continuance was asked by defendant because of the absence of the matron of the Orphans' Home to which the children of the parents were sent after the death of their mother, in which it was stated in the affidavit that the children's grandmother visited them often while at the home, and coached and advised them what their testimony should be, so as to convict their father, and that she was antagonistic to him and had created a prejudice in the minds of the children which the Commonwealth's attorney agreed should be read as the deposition of the matron, Mrs. Davis. Held that this was a matter in the discretion of the court.

2. Same—Jurors—Acceptance—Challenges—On the trial of a murder case the Commonwealth accepted 12 qualified jurors, F. being one of them and appellant challenged five or six and the panel was again filled and accepted by the Commonwealth and again passed to appellant who challenged one of the new men and offered to excuse F. by a peremptory challenge, and the court refused to allow him to do so. Held this was correct.

3. Statement of Accused to Policeman—Competency as Evidence—On the trial of a husband for killing his wife, testimony was given that the accused said to a policeman that he had tried to kill his wife before. Held, this statement being made freely, without duress, was competent to show motive and the state of the husband's feeling toward his wife.

4. Murder Instruction—Sufficiency of Evidence—Where the testimony shows that the husband killed his wife by stabbing her

in the neck and chest, while she was begging him not to kill her, the court on the trial was authorized to give the murder instruction.

EARL & BARBOUR for appellant.

JAMES BREATHITT, Atty. Genl. and Chas. H. MORRIS, Asst. Atty. Genl. for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

Appellant was indicted, tried, convicted and sentenced to death for the murder of his wife. He asks that the judgment be reversed for several reasons The first is that the court erred in not granting him a continuance because of the absence of a witness, Mrs. Davis, a matron of the Colored Orphans Home. After the death of appellant's wife, their children were sent to that home. The children were introduced upon the trial by the Commonwealth and were important witnesses. Appellant stated in his affidavit for a continuance that the children's grandmother visited them often while they were at the Orphans Home, and coached and advised them what their testimony should be against their father so as to convict him. He also stated that the children's grandmother was antagonistic to him and created a prejudice in the minds of the children against him. The Commonwealth's attorney agreed that this affidavit might be read as the deposition of Mrs. Davis, and the court refused to continue the prosecution. Appellant's counsel claims in his brief that the full force and effect of Mrs. Davis' testimony was not obtained by the reading of the affidavit; that her personal presence was necessary for that purpose. This was not stated in the affidavit and it seems that the court's attention was not directed to it. This was a matter in the discretion of the court, and we can not say that it abused the discretion. The Commonwealth's Attorney was not compelled to admit that the facts stated in appellant's affidavit as to what Mrs. Davis would say were true, but only to admit that Mrs. Davis would testify as stated therein if present, as the trial took place at the second term after the indictment and arrest. (Criminal Code, section 189.)

The second complaint is that the court erred in refusing to allow appellant to peremptorily challenge one John H. Fleck, a member of the jury that tried him.

The facts are about these: The Commonwealth accepted and passed to appellant twelve qualified jurors, Fleck being one of them, and appellant challenged five or six of them and the panel was again filled and accepted by the Commonwealth and again passed to appellant who challenged one of the new men and offered to excuse Fleck by a peremptory challenge and the court refused to allow him to do so. The court's action in this was in accord with the authorities of Mundy v. Commonwealth, 81 Ky., 233, and several other cases. In the Mundy case, the appellant challenged one Holdy after he had failed to challenge him when he was first presented precisely as did appellant in the case at bar, and the court determined in that case that the appellant had no right to challenge him except for a good cause shown. The court said:

"In this case no good cause was shown for permitting appellant to challenge the juror he previously, at the proper time, passed on, or had the opportunity to pass on; and hence, the court did not err in refusing to make in his favor an exception to the rule that 'each party must exhaust his challenges to each juror before the other begins.'"

The record in the case at bar does not disclose any cause shown to the court why appellant should have a right to peremptorily challenge Fleck at the time he undertook to do so.

Appellant claims that the lower court erred in allowing certain policemen to testify, in substance, that appellant said to them, in answer to questions, that he had tried to kill his wife before. This statement was made freely, without duress, without being put in fear and without hope of reward and was competent testimony to show motive and the state of appellant's feeling toward his wife.

Appellant's counsel also complain because the court allowed the Commonwealth's attorney to ask appellant, on cross-examination, the following: "Did you shoot at your wife within less than a year before she was killed? Were you arrested for shooting at with intent to kill her?" and "Weren't you arrested by a policeman for assaulting your wife?" He answered these questions "No," and there was no proof showing that

he had been guilty of any of these things. The questions as to the shooting at and assaulting his wife were competent for the same purposes given above, but the question about his being arrested by a policeman was improper, but not prejudicial in this case as there was not the slightest proof that this thing occurred.

Complaint is also made by appellant of instruction No. 1. He contends that there was no testimony in the case tending to prove a willful murder had been committed. The facts with reference to the killing are about these: Appellant and his wife had been married about sixteen years, but it seems they had lived in discord for the last three years before the killing. The proof shows that each had made threats and attempted to do bodily harm to the other; that the wife, on account of this estrangement, had been away from home for several months, staying with her mother, Mrs. Pigg; that she returned home at times during the day to see her children; that on the evening before the killing at one o'clock in the morning, appellant learned that she was coming home and sent his two oldest children to meet her; that she arrived at about eight o'clock, complained of being hungry and appellant gave the children some money to go buy some fish and sausage, which they did and he and his wife ate it. Their cottage consisted of three rooms, built directly behind the other. Their little girl, thirteen years of age, occupied the front room with her little brother, whose age is not given; the oldest boy, who was about fifteen years of age, occupied a bed in the middle room with his three little brothers, one of whom was about ten years of age, the age of the other two was not given. The little girl testified that when she went to sleep her mother was reading a newspaper to her father who was lying on the floor. The oldest boy stated that his father was reading a newspaper to his mother when he went to sleep. There was no testimony, except appellant's, as to what took place from that time until the killing occurred. The little girl testified that she was awakened by the holloing and screaming of her mother; that her mother called for the oldest boy to come and help her and keep her father from killing her; that her brother ran and grabbed her father's hand in which he had the knife; that her father jerked away from him, knocked him down and told him

to keep away; that her father said to his wife you need not hollo, I am killing you. She says that when she awoke her father had hold of her mother with his left hand and arm and was stabbing her with his right; that he stabbed her about five times after she awoke; that while stabbing her he seemed to be dragging her towards the front room and then back; that her mother fell dead near the entrance to the middle room; that her father then picked up his hat, told all the children "good-bye" and left the house. The two boys, ten and fifteen years of age, testified, in substance, to the same facts as did the little girl. It appears that appellant and his wife were both dressed at the time of the killing. Appellant testified that his wife did not go to bed that night; that he was lying on the floor but did not go to sleep because he was afraid his wife might kill him, as she made threats that night. He stated that soon after one o'clock in the morning he got up and started to the kitchen; that there was no door leading from the middle room into the kitchen and he had, therefore, to go outside and enter the kitchen; that about the time he passed out of the door going from the middle room he met his wife and she assaulted him with a butcher knife; that he grabbed her hand in which she had the knife and by force pushed it into her chest. He remembered that he did this twice but could not say just how often. He stated that all he heard his wife say during the time was when he pushed the knife into her chest she holloed "Oh!" He denied that the boy grabbed his arm or that he knocked him down. He, in fact, denied all the statements made by the children with reference to the killing; about the only thing he agreed with them in was that he picked up his hat and told them good-bye.

The doctor who visited her immediately after she was killed testified that she had two stabs in her chest which entered her lungs, and a stab in the neck; that either of the wounds in the chest would have killed her. The undertaker testified to seeing the same stabs and also to seeing two in the back and two in the arm.

The children testified that while their father was stabbing their mother she was begging him not to kill her.

As no witness saw the beginning of the trouble, the court gave instructions to meet every phase of the case, that is, one on murder, one on manslaughter, voluntary and involuntary, and one on self-defense, all of which were in proper form. As the testimony shows that appellant made threats against his wife; that his treatment of her was bad; that he had an apparent determination and avowed purpose to kill her and that he did kill her, the court was authorized to give the murder instruction.

There was overwhelming and convincing evidence of a most horrible and brutal murder and the jury imposed the death penalty.

We find no error prejudicial to the substantial rights of appellant, therefore, the judgment is affirmed.